## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VALNET INC. and HASSAN YOUSSEF,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE WRAP NEWS INC.,<br><br>    Defendant. | Civil Action No. |

## COMPLAINT

Plaintiffs Valnet Inc. ("Valnet," "the Company") and Hassan Youssef (together with Valnet, "Plaintiffs"), by and through their attorneys, Buchanan Ingersoll & Rooney PC and Davis+Gilbert LLP, for their Complaint against defendant The Wrap News Inc. ("Defendant" or "The Wrap"), allege as follows:

## NATURE OF THE ACTION

1.  This action arises out of the malicious tortious conduct of Defendant's online media outlet, "TheWrap," and its reporter Umberto Gonzalez ("Gonzalez"). On March 20, 2025, TheWrap[1] published an inflammatory hit piece by Gonzalez, provocatively titled *Valnet Blues: How Online Porn Pioneer Hassan Youssef Built a Digital Media 'Sweatshop'* (the "Article").

2.  In the Article, TheWrap smears both Valnet and its Chief Executive Office and Co-Founder Hassan Youssef ("Youssef"), for the purpose of tarnishing their reputations, thereby giving The Wrap a commercial advantage over Valnet.

---

[1] As used herein, "The Wrap" refers to the Defendant publisher, while "TheWrap" refers to Defendant's publication.

3.     Defendant intended that the Article attack the integrity of Youssef and Valnet, which the Article accomplishes with willful disregard for the inaccuracy of the statements it contains and the false impressions its strategic omissions impart to readers.

4.     In addition, to attract attention to its hit piece, The Wrap exploited Valnet's copyrighted photographs—without permission or justification—and included them as part of its smear job against Plaintiffs.

5.     Defendant's repudiation of basic journalistic standards has already caused Valnet injury.  That harm is escalating, as an increasing number of press outlets republish and direct readers to the false and misleading Article.  In the past month since TheWrap released the Article, Valnet has received concerned inquiries from vendors and industry partners; a high-profile partner for an event hosted by a Valnet brand has declined to pursue plans to include the Valnet brand in the event and to significantly expand the event; a prominent film studio has canceled another event planned with a Valnet brand; a financial institution has declined to extend Valnet millions of dollars in financing, in a transaction that was approaching closure at the time of the Article; other partners have expressed significant concerns regarding pending transactions with Valnet; and still others have expressed their wish not to be associated with the Valnet brand.   In addition, persons who agreed to interviews with Valnet journalists have backed out of those commitments, and candidates for senior editorial positions with Valnet have declined employment offers. In each instance, the vendors, partners, interviewees and employment candidates have identified or alluded to the false and misleading Article as a reason, or the *only* reason, for their actions.

6.     At the same time, Defendant's false statements have undermined Youssef's credibility and his business relationships, and the trust of his peers in the business community.

They further have caused him emotional distress in his personal life, affecting his relationships with his children, his other family members, his friends and his community.

7.    Upon information and belief, gaining this unfair business advantage over Valnet, through loss of readers, business partners, advertisers and staff, was precisely The Wrap's motive for publishing the Article.

## PARTIES

8.    Valnet is a Canadian corporation with its principal place of business in Montréal, Québec.  Founded in 2012 in Montréal, Valnet is a digital publishing and media investment company whose mission is to deliver high quality content to audiences through its many portfolio publications.

9.    Youssef is a resident of Montréal, Québec.  Youssef is the Co-Founder and Chief Executive Officer of Valnet.

10.    Upon information and belief, The Wrap is a Delaware corporation with its principal place of business in Los Angeles, California.  The Wrap describes itself on its website as "the leading, authoritative digital news organization covering the business of entertainment and media."

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, inasmuch as at least one of the claims arises under the laws of the United States.  Further, the Court has jurisdiction over the other claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal law claim that they form part of the same case or controversy.

12.    In addition, pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000 exclusive of interest and costs, and the dispute is between citizens of a state and subjects of a foreign state.

3

13.     Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(2), as to all claims because The Wrap resides within this judicial district, in that The Wrap is subject to jurisdiction here as a Delaware corporation.

## FACTUAL ALLEGATIONS

### A.    The Wrap Maliciously Published the Article, Which Other Press Outlets Are Republishing and Directing Readers To

14.     Valnet and The Wrap are direct competitors, both seeking to attract readers of entertainment news to their respective publications. As such, any loss of credibility or other reputational harm suffered by Valnet will result in a direct competitive advantage for The Wrap.

15.     On March 20, 2025, TheWrap published the Article.  A true and accurate copy of the Article is annexed hereto as Exhibit A.

16.     TheWrap presents the Article as a work of investigative journalism. In actuality, however, the Article prioritizes sensationalism at the expense of an accurate narrative.

17.     As further detailed below, the Article contains false, misleading, derogatory, and other highly prejudicial statements and material omissions regarding Youssef and, by extension, Valnet.  As a result of these statements and omissions and the Article's overall outraged tenor, the Article communicates to the ordinary reader that Valnet is run by an unethical, greedy and corrupt executive—namely, Youssef—thereby damaging the reputations of both Youssef and Valnet.

18.     The Article has already been widely shared by press outlets in various media, and continues to be republished and reported by other news outlets and on social media.

19.     For example, online news outlet Clownfish TV published an article and a video report excerpting the Article and referring to the Article as a "bombshell exposé" on Valnet.

20.     As of the date hereof, videos discussing the Article have been widely viewed.  For example, the Clownfish TV report has been viewed over 38,000 times and liked by over 2,900 users.

**B.     The Article Infringes on Valnet's Copyrights**

21.     In publishing the Article, Defendant used two of Valnet's copyrighted images (the "Images') to increase the appeal of the Article.

22.     The first Image is a "head shot" photograph of Youssef (the "Head Shot"), a foreign work in which Valnet owns the copyright.  The Head Shot is featured prominently above the Article's headline at the very top of the Article.  The Head Shot originally appeared on Youssef's LinkedIn profile and/or on Valnet's corporate website.

23.     The second Image is a photograph of Youssef speaking at Valnet's 10th anniversary party in Montréal (the "Anniversary Photo"), another foreign work in which Valnet owns the copyright.  The Anniversary Photo appears prominently near the conclusion of the Article.  The Anniversary Photo originally appeared on Youssef's LinkedIn page.

24.     Defendant used the Images without permission or authorization from Valnet, and without any legal justification.

**C.     The Article Defames Youssef and Valnet**

25.     The Article attacks Valnet by portraying its Co-Founder and Chief Executive Officer, Youssef—whom Gonzalez characterizes in the Article as "little-known" in the entertainment world and someone who has "maintained a low profile and stayed under the radar"— as an immoral businessman seeking enrichment at all costs, and especially at the expense of ethical business practices.

26.    As the title of the Article makes clear, TheWrap seeks to portray Youssef and Valnet in a negative light, calling Youssef an "online porn pioneer" (thereby characterizing Youssef's early investment in several adult entertainment websites in a manner intended to evoke stereotypes about the pornography industry, and undermining Youssef's character and the reputation of Valnet), while also stating that he "built a digital media 'sweatshop'" when he created Valnet.

27.    The Article creates the negative inference that Youssef was or is personally involved in or responsible for various serious, appalling and criminal events alleged throughout. The Article is replete with such allegations.

28.    For example, the Article refers to a video uploaded by a user of the video-sharing website Pornhub in 2009 depicting the rape of a 14-year-old (the "Video"), which the victim repeatedly pleaded with Pornhub to take down, but which Pornhub initially failed to do.

29.    The Article places this discussion immediately after asserting that Youssef and his brother operated their business affairs through a supposedly "complex web of corporate entities," and prior to falsely alluding that Youssef was actively involved in Pornhub until 2010. This constructed timeline effectively implicates Youssef in the horrifying failure of Pornhub to immediately remove the Video from its website. The false association of Youssef with both the Video incident and the operation of Pornhub is highly prejudicial to Youssef and thereby to Valnet, severely damaging the reputation of both.

30.    The Wrap and Gonzalez knew or should have known that Youssef had nothing to do with the Video, its existence on Pornhub, or its delayed removal from Pornhub. Indeed, Gonzalez never sought Valnet's or Youssef's comment on this incident, in reckless disregard of the truth or falsity of the allegations TheWrap published.

31.     In fact, in 2009, at the time the Video was created and uploaded to Pornhub, a company called Interhub operated Pornhub.  Youssef's company, Mansef Inc., was merely a minority investor in Interhub, and Youssef had no knowledge of, let alone control over, the day-to-day operations of Pornhub.  Interhub sold its interest—and thus, Mansef's indirect interests—in Pornhub in 2010. Not until 2020, when the initial failure of Pornhub to remove the Video from its website became public, did Youssef learn of the Video and its former presence on Pornhub.

32.     In its efforts to tarnish Youssef, the Article also falsely asserts that Youssef and his brother paid millions of dollars as a fine in connection with money laundering accusations against them.

33.     In fact, neither Youssef nor any of his businesses has ever been accused of money laundering, nor has Youssef or any of his businesses ever paid any fine in connection with any criminal conduct.

34.     The event the Article falsely refers to as alleged "money laundering" was, in reality, not money laundering, but rather a licensing oversight—civil and not criminal in nature—in which a fiscal agent for Youssef's company neglected to obtain a money-transmitting license required for operations in the State of Georgia. The United States government seized certain funds held in the fiscal agent's accounts as a result, and initiated a civil forfeiture action against those funds. Youssef's company and the fiscal agent voluntarily appeared in the civil case as interested parties seeking to have the funds released.

35.     Ultimately, the parties settled this licensing dispute.  Neither Youssef nor his company or its agent admitted any wrongdoing.  The Government released over $4 million of the funds, and the balance was forfeited.

36.     Notably, the true facts concerning the civil forfeiture action are a matter of public record.  The pleadings, the settlement and the Consent Order of the United States District Court for the Northern District of Georgia for the civil action are all easily obtainable by the general public on the Court's docket.  Thus, anyone interested in accurately portraying the facts concerning the action and its resolution, including Gonzalez and Defendant, could easily have investigated and determined what happened here.

37.     Instead, however, Gonzalez and Defendant crowdsourced their facts from—and in the Article explicitly referenced as their authority—an online bulletin board forum for enthusiasts of adult entertainment, named "GoFuckYourself.com." Predictably, the anonymous posts on GoFuckYouself.com were not a reputable or reliable source of information on government investigations and judicial decisions.

38.     Gonzalez's failure to research and accurately report readily available facts, his failure to seek Youssef's or Valnet's comment on his money laundering claims, and TheWrap's decision instead to publish incomplete and misleading information, show, at best, an obvious abandonment of basic journalistic standards, and a reckless disregard for true and accurate reporting, if not an intentional misstatement of fact.

**D.     The Article Reflects The Wrap's Intent to Disparage and Discredit Youssef and Valnet**

39.     The tone of the Article as a whole further illustrates Defendant's heavily biased reporting, and intention to tarnish Valnet's reputation, by tainting its CEO and Co-Founder, Youssef, including by characterizing him as evasive, immoral and untrustworthy, and by portraying Valnet as lacking in credibility, disregarding media standards, producing subpar content, and engaging in exploitative business and employment practices.

8

40.     For example, by stating that "the Youssef brothers have scrubbed any mention of Mansef or their adult entertainment origins from their public personas on the Valnet site," the Article suggests that Valnet is selectively reporting, and deliberately concealing, Youssef's professional background, which casts Youssef in a suspicious light, as someone with something to hide. In reality, Youssef has not "scrubbed" or removed any information from the Valnet website. Valnet has never featured biographical information for any of its employees on its website, making TheWrap's false implication that Youssef and Valnet are actively trying to deceive the public both unfounded and damaging.

41.     Elsewhere, the Article characterizes Youssef's prior businesses as operating through a "complex web of corporate entities."  In actuality, the corporate structure of Youssef's business holdings has never been "complex" nor a "web."  The structure is and always has been straightforward and common.  Defendant employs this rhetoric in the Article to convince readers that Youssef and Valnet are untrustworthy.

42.     The Article further refers to Valnet and its portfolio companies as "sweatshops" where contractors are paid "bargain-basement" rates, are "exploited and discarded," and are directed to prioritize "mass quantity over quality to churn out mind-numbing SEO bait."  This hyperbolic and inflammatory language is not only false, it is also highly prejudicial to Valnet's business reputation and to Youssef's, as Valnet's CEO.

43.     The Article's false depiction of Valnet as unserious and lacking professionalism is further exemplified by Gonzalez's mischaracterization of his request to Valnet for comment on his assertions pending in the Article regarding Valnet's employment practices.  By falsely stating that a Valnet spokesperson responded that he was unavailable for comment on these issues because "he was on vacation," the Article portrays the Company as inexperienced and unsophisticated.  In

9

fact, the Valnet employee in question—who was not a Company spokesperson but rather an editorial employee that Gonzalez knew and to whom Gonzalez reached out directly—made a good faith effort to respond to TheWrap's request for comment, asking Gonzalez to provide specific, coherent questions in writing for the Company to answer (while incidentally noting that he was out of the office).

44.     Defendant repeatedly opted to convey to readers of the Article an impression of Youssef and Valnet that maximized sensationalism, and advanced Defendant's preconceived, biased and defamatory narrative, without regard to the true facts, and for its own commercial benefit.

**E.     The Wrap's Article Has Injured Youssef**

45.     The Article has already caused injury to both Youssef and Valnet, and will continue to do so.

46.     Prior to the Article, Youssef enjoyed a positive reputation in both his personal and professional lives.

47.     The Article and the defamatory statements it contains have undermined Youssef's credibility, trustworthiness, and business relationships. This reputational harm inhibits Youssef's ability to operate his otherwise successful business.

48.     The statements about Youssef's character, including the false and misleading connection drawn between him and the Video scandal and the false allegations that he was involved in criminal activity, are extremely prejudicial.

49.     Youssef has already observed a loss of trust and credibility amongst his peers in the business community, causing Youssef monetary harm.

50.    Youssef has also seen ramifications extending to his personal life, as a father, friend, and community member in good standing.

51.    The implications for Youssef's personal and professional life have caused Youssef tremendous emotional distress, affecting (among other things) his mood, temperament and his ability to sleep.

**F.    The Wrap's Article Has Injured Valnet**

52.    Valnet is a leader in the digital media publication industry.  The Company's 27 publications and brands have hundreds of millions of readers and viewers each month and generate billions of advertising impressions each month.

53.    Valnet relies on strategic partnerships for business development. Valnet further relies on its reputation as a supporter of high-quality journalism and of talented writers and editors to staff its ever-growing business and need for engaging and well-written content, and to grow its business through mergers and acquisitions.

54.    Valnet has already seen the Article and the false statements it contains impair Valnet's ability to recruit new employees and contractors. For example, Valnet was in the process of hiring two employees for senior editorial roles, when, in the days immediately following the publication of the Article, the candidates abruptly declined Valnet's employment offers, explicitly citing or alluding to the Article, and the negative publicity created by the false statements therein, as all or part of the reason they declined their offers.

55.    The Article is also circulating on a Facebook page for freelance journalists titled "Freelance Game Journo Network."  Upon information and belief, the defamatory statements in the Article have impacted and will continue to impact Valnet's ability to hire writers and editors to create the content that is essential to Valnet's business.

11

56.    Valnet executives have also had to address concerns from multiple business partners and potential partners. These partners have expressed concerns about the false allegations in the Article, and certain pending transactions between these partners and Valnet have been held up and/or placed into question as a result.

57.    For example, prior to the Article, Valnet was in the midst of negotiating a multi-million dollar financing transaction with a major financial institution.  The transaction was moving smoothly toward closure until the Article's publication, after which the financial institution began asking questions about the Article and expressing concerns.  The institution has recently informed Valnet that it will not move forward to close the transaction, citing the false and misleading Article as its reason.

58.    In addition, Valnet had partnered with a prominent film industry business to host a series of film screenings, several of which had already occurred in association with one of Valnet's entertainment website brands, Collider. Following the success of these initial screenings, Valnet and the partner discussed a significant expansion of the series, and associating Valnet's name with this valuable business opportunity.  After the publication of the Article, however, the partner declined to advance those plans and stated that it is no longer comfortable having Valnet's name associated with the series, in light of the negative publicity Valnet has received from the Article and the defamatory statements it contains.

59.    Upon information and belief, shortly after the partner withdrew from its plans to expand the screening series and to attach Valnet's name to the series, The Wrap and Gonzalez began contacting that partner and another Valnet industry partner, a prominent film studio, specifically calling the studio's attention to the Article and making the studio aware of the Article for the first time.  Upon information and belief, The Wrap and Gonzalez did so in bad faith, with

an improper purpose of inflicting harm on Valnet, and not in furtherance of any true journalistic activity. Within days of these communications from The Wrap and Gonzalez, the studio insisted on canceling an upcoming screening, precluding Valnet from realizing any benefit from this business opportunity.

60. Further, Valnet's revenues are primarily driven by advertising, which itself is driven by readership. Upon information and belief, the Article and the false statements therein have created negative publicity for Valnet and its publishing businesses, which, on information and belief, has caused and will cause Valnet to lose readership and advertising revenue. Negative publicity from the false and misleading Article, thus, has directly resulted in and will continue to directly result in financial losses for Valnet.

<u>**COUNT I**</u>
**(Libel *Per Se*)**
**(On Behalf of Both Plaintiffs)**

61. Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

62. In March 2025, The Wrap published the Article.

63. The Article and the statements therein were of and concerning Youssef and Valnet.

64. The Article falsely and irresponsibly accused Youssef and Valnet of improper conduct, impugning Youssef personally and his Valnet business and intentionally damaging both of their reputations.

65. The Article contained false statements and misleading omissions concerning Youssef, Valnet's CEO, namely, that (1) Youssef was accused of money laundering and was forced to pay a $2.1 million fine as punishment, and (2) that Youssef somehow condoned,

13

facilitated or allowed the publication of the Video, and ignored repeated pleas by the victim of the rape depicted in the Video to have the Video removed.

66.     These false and misleading statements and omissions—suggesting that Youssef or his previous businesses have been accused of money laundering and/or were involved in Pornhub's failure to remove the Video after the victim's pleas to do so—expose Youssef and Valnet to public contempt, aversion or disgrace.

67.     In publishing the Article, The Wrap was acting in bad faith, for an improper purpose, with the intent to cause injury to Youssef and Valnet.

68.     As the Article acknowledges, Youssef is relatively unknown, and has maintained a low profile.  Youssef is thus a private figure.

69.     Even assuming Youssef were a public figure, however, The Wrap's misconduct grossly exceeds ordinary negligence.  The Wrap published the Article with actual malice, knowing of the explicit and implicit falsity of statements therein, and/or with reckless disregard for the truth or falsity of those statements.

70.     As a result of The Wrap's conduct alleged herein, Youssef has suffered and will continue to suffer economic and non-economic losses, including lost earnings, harm to his name and reputation, humiliation, emotional distress, and other non-economic damages, in an amount to be determined at trial.

71.     In addition, Valnet has suffered and will continue to suffer economic and non-economic losses, including lost revenues, impairment to its name and reputation, and other non-economic damages.

72.     Further, The Wrap's conduct was wanton and willful, justifying an award of punitive damages.

## COUNT II
**(Copyright Infringement)**
**(On Behalf of Valnet)**

73.     Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

74.     Valnet owns the copyrights in the two original Images.

75.     Each of the Images is copyrightable subject matter under the laws of the United States.

76.     Neither of the Images is a United States work as defined by the Copyright Act, and so copyright registrations are not required for these works.

77.     Access is not required to establish copyright infringement of a work by identical or strikingly similar works, but even if it were, Defendant had ample, unrestricted access to each of the Images through the publicly-accessible websites on which the Images originally appeared.

78.     In publishing the Article, The Wrap reproduced and publicly displayed Valnet's copyrighted Images.

79.     Defendant never asked permission or received authorization from Valnet to reproduce, publicly display or otherwise use the Images, whether in connection with the Article or otherwise.

80.     Defendant had no legal justification for using or reproducing or displaying the Images in the Article without authorization from Valnet.

81.     Defendant's actions violate Valnet's exclusive rights under the Copyright Act and constitute copyright infringement.

82.     As a direct and proximate result of The Wrap's copyright infringement, Valnet is entitled to recover damages it will and has sustained, and any gains, profits and advantages

15

obtained by Defendant as a result of its acts of infringement as alleged above.  At present, the amount of such damages, gains and profits cannot be fully ascertained but will be established at trial.

83.    In addition, Valnet is entitled to injunctive relief prohibiting Defendant's further infringement of the Images.

## COUNT III
### (Unfair Competition and Deceptive Trade Practices)
### (On Behalf of Valnet)

84.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

85.    Valnet is a leader in the digital media publication industry and relies on strategic partnerships for business development. Valnet relies on its positive reputation in the publishing industry to secure commercial partners.

86.    Valnet further relies on its positive reputation in the publishing industry to hire employees and contractors.

87.    Valnet and The Wrap compete for readers, advertisers, writers and editorial staff.

88.    The Wrap's libelous and otherwise misleading and disparaging statements and omissions in the Article were intended and have had the effect (and will continue to have the effect) of wrongfully inflicting harm on its direct competitor Valnet. Defendant's wrongful conduct also constitutes deceptive trade practices in violation of 6 Del. C. § 2532(a)(8).

89.    The Article has wrongfully interfered and thereby defeated Valnet's legitimate expectancy of entering into valid business relationships.  The Wrap's publication of the Article, therefore, constitutes unfair competition.

90.     At least two candidates for senior editorial roles at Valnet declined offers of employment based entirely or partly on the false and misleading assertions about Valnet in the Article.

91.     Upon information and belief, the Article has impacted and will continue to impact Valnet's ability to hire employees and contractors to create content for Valnet's publications.

92.     Valnet executives have also had to address concerns from multiple business partners and potential partners. These partners have expressed concerns about the false allegations in the Article, and certain pending transactions between these partners and Valnet have been held up and/or placed into question as a result.

93.     After the publication of the Article, an executive from the film industry business sponsoring the screening series discussed above told Valnet that his company will not be seeking to expand the series as previously planned, and is no longer comfortable having Valnet's name associated with the series, in light of the negative publicity received from the Article.  Shortly thereafter, a prominent film studio canceled another upcoming screening event planned with Valnet's Collider brand after Defendant contacted the studio and called its attention to the Article.

94.     In addition, after publication of the Article, a major financial institution backed away from a multi-million dollar financing transaction it was on track to close with Valnet, and partners negotiating at least two other transactions with Valnet have expressed concern about moving forward with those transactions.

95.     The Article and its false statements have created negative publicity, which, upon information and belief, has caused and/or will cause Valnet to lose readership, leading to financial losses for Valnet.

96.    As a result of The Wrap's unfair competition, Valnet has sustained and continues to sustain damages in an amount to be determined at trial.

97.    The Wrap's conduct was wanton and willful, justifying an award of punitive damages.

## COUNT IV
### (Tortious Interference with Prospective Business Relations)
### (On Behalf of Valnet)

98.    Plaintiffs repeat, reallege, and incorporate by reference the allegations in each of the foregoing paragraphs as though fully set forth herein.

99.    Prior to Defendant's wrongful actions, Valnet enjoyed advantageous economic and contractual relations and other business opportunities with numerous partners, which Valnet reasonably expected would continue to result in economic benefits to Valnet.  Valnet enjoyed substantial profit from its economic and contractual relationships and business opportunities with said partners, and invested significant funds in soliciting, developing, and maintaining these relationships and opportunities.

100.    Given the relationship of trust and confidence developed between Valnet and its partners, and Valnet's investment of time and money to further that effort, Valnet reasonably expected that its relationships with its partners would continue in the future.

101.    Defendant, intentionally, wrongfully, and without justification, interfered with Valnet's relationships with its partners, including (without limitation) by contacting the screening series partner and other participants in the series, to call their attention to the Article and to harass them, seeking additional information about Valnet and its publication brands.

102.    Upon information and belief, the screening partners were concerned that their films and their own companies would be targeted in future hatchet job articles by Defendant, and the

18

partners thereafter cancelled Valnet's participation in the screening series altogether.  Upon information and belief, this was Defendant's plan.

103.    The screening series partner and the prominent film studio were prepared to enter certain beneficial business relationships with Plaintiff but were dissuaded from doing so by Defendant's wrongful actions described herein.

104.    In addition, a major financial institution, dissuaded from moving forward by the Article, backed out of a multi-million dollar financing transaction for Valnet that had been moving smoothly toward completion.

105.    By the above-described acts, Defendant tortiously and intentionally interfered with the expected business opportunities between Valnet and its partners.

106.    As a direct and proximate result of Defendant's actions, Valnet has been injured and suffered damages in an amount to be proven at trial.

107.    Valnet has also suffered, and will continue to suffer, irreparable harm from Defendant's actions, and will continue to suffer such harm absent injunctive relief.

108.    Defendant's conduct was wanton and willful, justifying an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Valnet Inc. and Hassan Youssef respectfully request that this Court enter judgment against The Wrap News, Inc. as follows:

A.    On Count I, for damages in an amount to be determined at trial, but no event less than $1.5 million to Youssef and $30 million to Valnet;

B.    On Count II, for damages in an amount to be determined at trial;

C.    On Count III, for damages in an amount to be determined at trial;

D.      On Count IV, for damages in an amount to be determined at trial, but in no event less than $30 million;

E.      For an award of costs and disbursements of this action;

F.      For punitive damages in an amount to be determined at trial but in no event less than $3 million;

G.      For permanent injunctive relief barring Defendant from further publishing the false and misleading Article, mandating that Defendant publish a corrective statement in connection therewith, and barring Defendant from infringing Valnet's copyrights in the Images and further tortiously interfering with Valnet's business relationships; and

H.      For such other and further relief as the Court deems just and proper.

Dated: April 25, 2025                          BUCHANAN INGERSOLL & ROONEY PC

OF COUNSEL:                                    By:  _/s/ Jeffrey B. Bove_____
                                               Rex A. Donnelly (#5692)
DAVIS+GILBERT LLP                              Jeffrey B. Bove (#0998)
Ina B. Scher (*pro hac vice* forthcoming)      Christopher H. Blaszkowski (#5673)
David Greenberg (*pro hac vice* forthcoming)   500 Delaware Avenue, Suite 720
1675 Broadway                                  Wilmington, DE 19801-7407
New York, New York 10019                       Tel. 302-778-3460
(212) 468-4800                                 Facsimile (302) 552-4295
ischer@dglaw.com                               rex.donnelly@bipc.com
dgreenberg@dglaw.com                           jeffrey.bove@bipc.com
                                               christopher.blaszkowski@bipc.com

                                               *Attorneys for Plaintiffs*
                                               *Valnet Inc. and Hassan Youssef*

20